| | | |
|---|---|---|
| DOCKET NO: MMX-CV17-6018330-S | : | SUPERIOR COURT |
| CHARLES DICKINSON<br>*Plaintiff* | : | JUDICIAL DISTRICT OF MIDDLESEX |
| v. | : | AT MIDDLETOWN |
| WILLIAM W. BACKUS HOSPITAL<br>*Defendant* | : | JANUARY 26, 2018 |

## FOURTH AMENDED COMPLAINT

1. Plaintiff, Charles Dickinson, ("Mr. Dickinson") at all times relevant herein was a resident of East Haddam, Connecticut.

2. Mr. Dickinson was employed by Defendant, William W. Backus Hospital, ("the Hospital") on or about March 3, 2014 as a Security Guard in the Public Safety Department.

3. The Public Safety Department at the Hospital had approximately 15 employees.

4. Mr. Dickinson was later promoted to Charge Officer in December 2014 while he was still on probation because of his exemplary work performance.

5. While employed at the Hospital, Mr. Dickinson witnessed multiple patients come lose from ineffective nylon Velcro restraints. Mr. Dickinson and other security guards would constantly have to come back and re-restrain patients. When Mr. Dickinson requested newer and more effective restraints, this request was denied.

6. Sometime in April 2016, Mr. Dickinson was transferred from the Hospital to work as a Security Guard for the Backus Outpatient Care Center, ("BOCC").

7. While working at BOCC, Mr. Dickinson witnessed numerous incidents that called into question his own safety, and the safety of others around him.

8. On one occasion at the hospital, a patient jumped over the nurse's station without warning, and attacked him and another hospital employee.

9. Mr. Dickinson's overall Supervisor, Andrew Ellis ("Mr. Ellis") was in charge of reviewing any complaints and requests for safety equipment.

10. On one occasion at the hospital, Mr. Dickinson complained that dividers be placed at the nurse's station after a psychiatric patient jumped over the station and attacked him and another guard but that suggestion ignored.

11. Mr. Dickinson complained about the lack of some equipment at the hospital and BOCC to help reduce injuries to the Security Guards and other hospital staff members but that request was ignored.

12. On more than one occasion the patients at the hospital would become violent and pick up chairs and use them as makeshift shields, threatening to throw the chairs at hospital personnel or hit them with the chairs, and injuries were reported roughly every week with security.

13. One example of the requested equipment was a clear acrylic riot shield to prevent contact with out-of-control patients at the hospital. This request was denied.

14. On another occasion at the hospital, Mr. Dickinson requested some PR-24 collapsible control batons, a great tool for protection when used with effective blocking techniques, something on which the security guards were trained. This request was also denied.

15. On numerous occasions at BOCC, Mr. Dickinson was asked to perform duties that were outside the scope of his job description increasing his fellow security guards and the patient's risk of injury.

16. Mr. Dickinson had been asked to watch the gift shop at BOCC while a volunteer who ran the gift shop stepped away.

17. Mr. Dickinson had been told that he would be required to hold children down who were fighting having blood drawn at the blood draw station at BOCC. This situation never arose but Mr. Dickinson refused to perform that task in a conversation with Mr. Guiher.

18. At one time Mr. Dickinson raised the issue of the liquid oxygen tank leaking at BOCC, and being frozen and that a camera needed to monitor the tank but nothing was ever done about that.

19. As a result of the repeated refusals by supervisors at the hospital and BOCC to even consider purchasing the necessary safety equipment, or make the necessary changes in procedure, to keep the staff at the hospital safe, Mr. Dickinson became increasingly uncomfortable in his position as security guard with BOCC and also became increasingly concerned about the health, safety, and welfare of the staff and patients at BOCC.

20. As a result of the continued requests that Mr. Dickinson perform duties outside the scope of his job at BOCC, such as restraining children, pushing patients to and from appointments, and watching the gift shop, Mr. Dickinson became increasingly uncomfortable in his position as security guard at BOCC.

21. Mr. Dickinson was assured that he would not be asked to perform duties outside the scope of that of a public safety officer but nevertheless he was asked to perform these duties at BOCC.

22. There was only one security officer at BOCC and to take that person away from their function of guarding the safety of the staff and patients at BOCC puts everybody at risk.

23. By the middle of May 2016 it became clear to Mr. Dickinson that his efforts to get BOCC to take the safety of its staff and patients seriously were not welcome and in fact worsened his position and work at BOCC.

24. As a result, Mr. Dickinson had no choice but to resign his position as Public Safety Officer with BOCC.

25. Mr. Dickinson's last day as Public Safety Officer with BOCC was June 1, 2016.

26. The Defendant wrongfully discharged the Plaintiff in violation of public policy, when the Plaintiff was constructively terminated for complaining about the working conditions at Backus Hospital and BOCC.

27. As a result of the conduct of Andrew Ellis, and BOCC, Mr. Dickinson's employment with the defendant was constructively terminated and he has sustained damages.

**WHEREFORE,** the plaintiff claims the following:

1. Monetary damages in the amount of $15,000 or more exclusive of interest and costs; and
2. Such other relief, legal or equitable, that the Court deems just and proper.

PLAINTIFF
CHARLES DICKINSON

By___/s/ 407831_____
James F. Sullivan, Esq.
Howard, Kohn, Sprague & FitzGerald
237 Buckingham Street
Hartford, Connecticut 06126-1798
(860) 525-3101 Juris No. 28160
His Attorney